FILED

2023 Aug-09  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **JUSTIN BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:21-cv-1491-LCB** |
| | § | |
| **CHEROKEE NITROGEN, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## OPINION & ORDER

Plaintiff Justin Brown seeks injunctive relief and damages in this civil rights lawsuit against his former employer, Cherokee Nitrogen LLC, for purported violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981; the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

In sum, Brown alleges that Cherokee intentionally discriminated against him on the basis of race, retaliated against him for complaining of race discrimination, and retaliated against him for taking FMLA leave. Cherokee now moves for summary judgment on each of Brown's claims. For the reasons to follow, Cherokee's motion (Doc. 30) is due to be granted in part and denied in part. More specifically, only Brown's FMLA and ADA claims are due to be dismissed.

## I.   BACKGROUND

Cherokee Nitrogen, LLC, a subsidiary of LSB Industries, Inc., is a manufacturing plant primarily engaged in the production of fertilizer and chemical components of fertilizer, such as

ammonia and urea.[1] Justin Brown is a black man whose employment at the manufacturing plant commenced in January of 2020 and ended in April of 2021.[2]

### A. Brown's Onboarding & Training

Brown assumed his first post at the loading dock, where he began his on-the-job training and was tasked with loading and unloading ammonia from trucks and railcars.[3] In addition to the provision of on-the-job training,[4] Cherokee maintains a system in which employees who satisfactorily complete certain online training modules are rewarded with increased wages.[5] Brown testified in his deposition that supervisor Wade Gaston interrupted his training-module progress on multiple occasions.[6] However, Brown ultimately completed the modules and received a raise for doing so, and he is aware of no other individual who completed the modules within a shorter aggregate time period.[7]

In March of 2020, Brown was transferred from the loading-dock position to the plant's urea area, where he began his on-the-job training for purposes of becoming a level-two operator.[8]

### B. The Gate Incident

The Coast Guard, which has jurisdiction over security at Cherokee's plant, requires security guards stationed at the plant's entryway gate to randomly request searches of employee vehicles entering the plant.[9] Upon arrival, all Cherokee employees are required to stop at the guard

---

[1] Declaration of Stuart Carter, Doc. 30-5 at 1; see also Doc. 7.
[2] Deposition of Plaintiff Justin Brown, Doc. 30-3 at 5.
[3] *Brown Dep.*, Doc. 30-3 at 5.
[4] *See, e.g.*, *Brown Dep.*, Doc. 30-3 at 17 (discussing on-the-job training at loading dock).
[5] Complaint ¶ 21; Answer ¶ 21.
[6] *Brown Dep.*, Doc. 30-3 at 11.
[7] *See Brown Dep.*, Doc. 30-3 at 5, 8.
[8] *Brown Dep.*, Doc. 30-3 at 20, 23–25.
[9] Declaration of Linda Peloquin, Doc. 30-10 at 2.

station, where their credentials are checked and, if requested, their vehicles searched.[10] Cherokee guards maintain a written record of all such searches.[11]

On June 4, 2020, a Cherokee security guard asked to search Brown's glove box, but Brown refused to open it without first being presented a search warrant.[12] Brown ultimately parked his vehicle in a nearby lot and rode the rest of the way with a co-worker.[13] He was not disciplined for his refusal to acquiesce to the search, or for anything else related to the Gate Incident.[14] With respect to the Gate Incident, Brown further testified as follows: (1) that Wade Gaston specifically instructed the guard to search Brown's vehicle—*i.e.*, that his selection for search was anything but random; (2) that June 4 was the first date on which Cherokee began implementing the policy;  and (3) that following the Gate Incident, his vehicle was searched each day for approximately one month.[15] Brown also filed a grievance with Human Resources Manager Keiaire Tate, complaining that the request to search his vehicle was racially discriminatory.[16] Tate conducted an investigation and ultimately found no merit to Brown's claims.[17] She followed up with Brown and explained her finding, and Brown concedes that Tate has never racially discriminated against or otherwise wronged him in any way.[18]

---

[10] Complaint ¶ 31; Answer ¶ 31.

[11] *See* Declaration of Kathy Williams, Doc. 30-11 at 2; see also Williams Decl. Ex. A, Doc. 30-11 at 4–57 (written records).

[12] *Brown Dep.*, Doc. 30-3 at 39.

[13] *Brown Dep.* Doc. 30-3 at 39–40.

[14] *Brown Dep.*, Doc. 30-3 at 42; *Peloquin Decl.*, Doc. 30-10 at 1–2.

[15] *Brown Dep.*, Doc. 30-3 at 35 ("[W]hen I pulled up that day . . . Wade Gaston [said], there he is right there, search his truck."); *id.* ("[B]efore the gate incident happened, searching the vehicles wasn't happening."); *id.* at 35–36 (describing daily search following Gate Incident).

[16] *Brown Dep.*, Doc. 30-3 at 42.

[17] *Brown Dep.*, Doc. 30-3 at 42.

[18] *Brown Dep.*, Doc. 30-3 at 42.

### C.      The Brook Incident

Cherokee's policy for covering an absentee-employee's shift is as follows: Unless the shift is otherwise voluntarily covered, the shift must be covered by the employee whom the absentee would otherwise have relieved.[19] Managers are responsible for facilitating that policy—*i.e.*, ensuring that each shift is covered when a scheduled operator is absent.[20] Operators are routinely required to extend their shifts to account for uncovered shifts.[21]

On January 26, 2021, Brown became upset with a particular manager ("Brook"), who was unable to find volunteer coverage for the first four hours of the shift following Brown's.[22] Cherokee provides evidence indicating that Brown expressed his dismay at the prospect of working four-hours' overtime by calling Brook a "stupid motherfucker."[23] Brown presents sworn testimony to the contrary.[24] In any event, Brook agreed to work the shift in Brown's stead.[25]

The next day, Brown was approached about an investigation regarding his conduct during the Brook Incident; in response, Brown complained to human resources that the investigation was racially discriminatory.[26] Linda Peloquin (director of human resources) and Michael Foster (general counsel) subsequently met with Brown to discuss his allegations in early February 2021.[27] Thereafter, Brown took FMLA leave for his mental disability (anxiety and depression) from February 5, 2021, through March 22, 2021.[28] Four days prior to Brown's return from leave, he was

---

[19] Compl. ¶ 53; Answer ¶ 53.
[20] Complaint ¶ 51; Answer ¶ 51.
[21] *Peloquin Decl.*, Doc. 30-10 at 2–3.
[22] *Peloquin Decl.*, Doc. 30-10 at 2; *Declaration of Mark Brook*, Doc. 30-13 at 1–2.
[23] *Brown Dep.*, Doc. 30-3 at 51; *see also Brook Decl.*, Doc. 30-13 at 1–2; *Deposition of Horace Dean*, Doc. 30-14 at 3–5; *Peloquin Decl.*, Doc. 30-10 at 2.
[24] *Brown Dep.*, Doc. 30-3 at 51.
[25] *Brook Decl.*, Doc. 30-13 at 2–3; *see also Dean Dep.*, Doc. 30-14 at 4.
[26] *Brown Dep.*, Doc. 30-3 at 59–60.
[27] *See* Doc. 32-10; *Deposition of Michael Foster*, Doc. 32-4 at 5; *see also Complaint*, Doc. 1 at 23 ¶¶ 213–216.
[28] *See Brown Dep.*, Doc. 30-3 at 66–67.

issued a written warning for his conduct during the Brook incident.[29] The discipline had no effect on Brown's title, pay, responsibilities, or anything of the sort.[30]

### D.    Brown's Termination

Cherokee employees have access to two equipment-vending machines, by way of which employees are able, free of charge, to obtain various job-related items for purposes of carrying out their duties. Because access to these machines requires presentation of employee identification, the transactions are electronically logged.

At some point in April 2021, the plant's general manager ("Carter") discovered that Brown had obtained a "grinding wheel,"[31] an item necessary for the duties of maintenance personnel, not operators, from one of the machines on April 4, 2021.[32] The item's value is $2.45.[33] Carter purportedly became suspicious that Brown was stealing company property; at Carter's direction, the urea-operations superintendent ("Koger") addressed the issue with Brown on April 15, 2021, in a meeting at which one of Brown's shift supervisors ("Lambert") was also present.[34] Brown represented that he had keyed in the grinding-wheel code by mistake.[35]

Koger then inspected the vending machines and discovered the vending machine does not dispense grinding wheels in the same manner as does, for example, a typical candy-vending machine. Instead, to retrieve a grinding wheel from this particular vending machine, an employee must enter the corresponding code, access a doored compartment, and *remove* the wheel from its

---

[29] *See Peloquin Decl.*, Doc. 30-10 at 2–3; *see also Brown Dep.*, Doc. 30-3 at 51–52.

[30] *Peloquin Decl.*, Doc. 30-10 at 3.

[31] In the evidentiary record, the term "cutting wheel," "cutoff wheel," and "grinding wheel" are used interchangeably.

[32] Carter Decl., Doc. 30-5 at 2–3; see also Declaration of Reese Koger, Doc. 30-15 at 2.

[33] *See Carter Decl. Ex. C*, Doc. 30-5 at 9 (itemized list).

[34] *Koger Decl.*, Doc. 30-15 at 2; *Declaration of Billy Lambert*, Doc. 30-16 at 1–2.

[35] *Koger Decl.*, Doc. 30-15 at 2; *Lambert Decl.*, Doc. 30-16 at 2; *Lambert Decl. Ex. A*, Doc. 30-16 at 3 (Lambert's Apr. 15 witness statement); *Brown Dep.*, Doc. 30-3 at 63.

original resting place.[36] Cherokee points to evidence of Brown's initial meeting with Koger and Lambert, in which Brown purportedly represented that upon mistaken entry of the grinding-wheel code, the wheel "fell out" in the typical candy-machine fashion—*i.e.*, that he did not physically open the machine and remove the wheel.[37] So, decided Koger, whether or not Brown entered the grinding-wheel code by mistake, he must necessarily have proceeded to intentionally open the doored compartment and remove the grinding wheel therefrom.[38] Brown, on the other hand, presents sworn testimony of his own that he never said the wheel had fallen out of the machine in the first place and, thus, that he had not been dishonest with Koger.[39]

Notwithstanding, Koger again met with Brown (and Lambert).[40] Koger's declaration states that when he "told Mr. Brown the cutoff wheel could not have fallen out of the machine as Mr. Brown had explained," Brown modified his story, essentially conceding for the first time to having taken the wheel out of the machine before placing it on a nearby table.[41] Brown swore in his deposition that his story underwent no such change between meetings one and two.[42]

Koger then asked Brown to vacate the premises pending further investigation into possible theft of company property.[43] Cherokee presents evidence that before leaving, Brown called Koger a "motherfucker."[44] Brown identifies evidence undermining Cherokee's—namely, a side-by-side comparison of the contemporaneous writings and subsequent declarations of each Koger and

---

[36] *See Koger Decl.*, Doc. 30-15 at 3–4; *see also Koger Decl. Ex. B*, Doc. 30-15 at 7 (photograph of vending machines); *Brown Dep.*, Doc. 30-3 at 62 (answering affirmatively the question, "It doesn't drop out of the machine, the door pops open and . . . you grab it and take it; is that right?).
[37] *E.g., Koger Decl.*, Doc. 30-15 at 2.
[38] *Koger Decl.*, Doc. 30-15 at 3–4; *see also Koger Decl. Ex. B*, Doc. 30-15 at 7 (photograph of vending machines).
[39] *E.g., Brown Dep.*, Doc. 30-3 at 63–64.
[40] *Koger Decl.*, Doc. 30-15 at 3–4; *Lambert Decl.*, Doc. 30-16 at 2; *Lambert Decl. Ex. A*, Doc. 30-16 at 3; *see also Carter Decl. Ex. A*, Doc. 30-5 at 5–6 (contemporaneous email from Reese Koger).
[41] *Koger Decl.*, Doc. 30-15 at 4.
[42] *See Brown Dep.*, Doc. 30-3 at 63–64.
[43] *See Koger Decl.*, Doc. 30-15 at 2–4; *see also Koger Decl. Ex. C*, Doc. 30-15 at 9; *Lambert Decl.*, Doc. 30-16.
[44] *Koger Decl.*, Doc. 30-15 at 4; *Lambert Decl.*, Doc. 30-16 at 2; *see also Carter Decl. Ex. G ("Termination Letter")*, Doc. 30-5 at 58. *But see Koger Decl. Ex. C*, Doc. 30-15 at 8–9 (Koger's Apr. 16 written statement); *Lambert Decl. Ex. A*, Doc. 30-16 at 3 (Lambert's Apr. 15 written statement).

Lambert. For example, Neither Koger's nor Lambert's contemporaneous statement mentions Brown having used foul language, but their subsequent sworn declarations do.[45]

Following Brown's suspension, Cherokee contacted various employees in order to ascertain whether any remembered seeing a rogue grinding wheel in the breakroom on or around the date in question; no employee reported such a memory.[46] Brown, for his part, has presented evidence that whether or not anyone remembered seeing a grinding wheel on the breakroom table around that time, placing mistakenly dispensed items on the table was so commonplace that it'd have been nothing worthy of note or memory.[47]

From the foregoing, Carter purportedly concluded that Brown had stolen the $2.45 grinding wheel.[48] Brown was fired on April 20, 2021; in support, Cherokee cited the following grounds: (1) Brown's alleged theft of the grinding wheel and failure to provide complete and accurate information during the related investigation, in violation of Cherokee's "Cardinal Rules"; and (2) Brown's "disrespectful . . . inappropriate language" in connection with the vending-machine investigation, for which Brown "had been recently disciplined" in the wake of the Brook Incident.[49] Brown maintains that he never lied about the manner in which he temporarily obtained the wheel, and that he did not curse at Koger during the investigation.

This suit, in which Cherokee now seeks summary judgment in full, ultimately followed.

---

[45] *See Koger Decl. Ex. C*, Doc. 30-15 at 8–9 (Koger's Apr. 16 written statement); *Lambert Decl. Ex. A*, Doc. 30-16 at 3 (Lambert's Apr. 15 written statement).
[46] See Termination Letter, Doc. 30-5 at 58.
[47] *See Brown Dep.*, Doc. 30-3 at 63 (testifying, for example, that "several items" are often left "on the break room table when [employees] mistakenly take [them] out"); *see also Koger Dep.*, Doc. 32-6 at 40–41 (disclaiming knowledge of whether placing mistakenly dispensed items on breakroom table was common practice for employees).
[48] *See Carter Decl.*, Doc. 30-5 at 2–4; *Carter Decl. Ex. C*, Doc. 30-5 at 9 (itemized list).
[49] *Termination Letter*, Doc. 30-5 at 58. *See also Carter Decl.*, Doc. 30-5 at 4–5 (discussing the Cardinal Rule provisions).

## II.   LEGAL STANDARD

To obtain summary judgment, the movant must demonstrate "that there be no *genuine* issue of *material* fact" standing in the way of a final judgment in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). So, the movant's entitlement to summary judgment depends upon his ability to point out portions of the record or pleadings that justify such relief. FED. R. CIV. P. 56(a). The inquiry ultimately turns upon "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

All the while, the court is dutybound to "draw[] all justifiable inferences" in favor of the nonmovant. *Daughtery, Crawford & Brown, LLP v. Am. Gen. Life Ins. Co.*, 374 F. Supp. 3d 1332, 1333 (M.D. Ga. 2019); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[C]redibility determinations and the weighing of evidence 'are jury functions, not those of a judge.'" (quoting *Liberty Lobby*, 477 U.S. at 255)). But the nonmovant "is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Liberty Lobby*, 477 U.S. at 256. Beyond the "mere allegations or denials of his pleading," the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (citation omitted); *accord* FED. R. CIV. P. 56(e). To that end, "merely colorable" or otherwise "[in]significantly probative" evidence cannot be said to raise a genuine factual dispute. *Liberty Lobby*, 477 U.S. at 249. In other words, if—from the record evidence—two reasonable juries could reach but one conclusion about a factual dispute, the dispute is not "genuine" and, thus, cannot preclude summary judgment. *See id.* at 250–52.

With respect to a particular fact in dispute, substantive law distinguishes the material from the immaterial: "Only disputes over facts that might affect the outcome of the suit under the

8

governing law will properly preclude the entry of summary judgment." *Id.* at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted."). In that vein, proof of futility with respect to just one element of a particular claim is sufficient for summary judgment purposes because doing so "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In these instances, "the plain language of Rule 56(c) mandates the entry of summary judgment." *Id.*

## III.   DISCUSSION

In this lawsuit, Brown claims as follows: (1) Cherokee discriminated against him on account of his race at various times during his 19-month employment, up to and including his termination, in violation of Title VII and § 1981; (2) Cherokee disciplined and ultimately terminated him for complaining of race discrimination, in violation of those same statutes; and (3) Cherokee disciplined and terminated him because he took medical leave, in violation of the ADA and FMLA. The Court addresses each theory of recovery in turn.

### A.   Intentional Race Discrimination

As an initial matter, claims of disparate-treatment race discrimination are subject to the same standard, whether they be brought under Title VII or § 1981; so, when asserted alongside one another, they need not be discussed separately. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985); *see also Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).

To survive summary judgment, a plaintiff must present evidence of the employer's discriminatory *intent* sufficient to create a triable fact question. *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327–28 (11th Cir. 2011); *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) (*Lewis I*). Absent direct evidence of intentional discrimination, the plaintiff may opt to fight a motion for summary judgment by way of the burden-shifting framework

established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Alternatively, the plaintiff may establish "a convincing mosaic of circumstantial evidence that would allow the jury to infer intentional discrimination by the decisionmaker." *Jenkins*, 26 F.4th at 1250 (quoting *Lockheed-Martin*, 644 F.3d at 1328). In the instant case, Brown argues that either avenue leads to the denial of Cherokee's motion on his disparate-treatment-discrimination claims.

> **i.      Brown fails to establish a *prima facie* case under *McDonnell Douglas*.**

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of proving up a *prima facie* case of race discrimination. *See, e.g.*, *Jenkins*, 26 F.4th at 1249. "The *prima facie* case serves an important function in the litigation" by "eliminat[ing] the most common nondiscriminnatory reasons" for an adverse employment action, *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981), and "produc[ing] a required conclusion in the absence of explanation" from the employer, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To establish a *prima facie* case, the plaintiff must demonstrate as follows: (1) that he belongs to a protected class; (2) that he was subjected to "adverse employment action"; (3) that he possessed the qualifications necessary for his position; and (4) that his employer treated more favorably a "similarly situated" employee—*i.e.*, a "comparator"—outside the plaintiff's protected class. *Jenkins*, 26 F.4th at 1249.

With respect to the second element, Brown alleges as follows: (1) Wade Gaston interrupted him during the online training modules; (2) Cherokee did not provide him on-the-job training with sufficient promptness following his arrival at the urea area; (3) Vehicular searches were requested of him with inordinate frequency; (4) Cherokee issued him written discipline for cursing during the Brook Incident; and (5) Cherokee terminated him without cause. In response, Cherokee argues that Brown fails to establish a *prima facie* case under *McDonnell Douglas* for the following

reasons: (1) Brown's first four arguments identify no adverse employment action as a matter of law; and (2) Brown fails to identify a similarly situated employee who received more favorable treatment—*i.e.*, a valid comparator—for purposes of his argument that Cherokee terminated him for being black.

a. <u>Adverse Employment Action</u>

Establishing an "adverse employment action" in the context of a discrimination claim requires proof of "a *serious and material* change in terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), *as stated in Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294 (11th Cir. 2018). "The asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 1238 ("[N]ot all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action."). Against that backdrop, Brown's failure to identify an adverse employment action (other than his termination, discussed *infra* Part III.A.i.b) becomes clear.

With respect to his training, Brown alleges that he was delayed in completing the online modules because Wade Gaston interrupted him on various occasions.[50] However, Brown concedes that he completed the modules and was awarded increased hourly compensation as a result.[51] Brown similarly alleges that later, upon promotion to the urea area, he received one-on-one training less quickly than was customary, but he concedes to having been trained immediately *vis-à-vis* the outdoor portion of his urea-area duties, trained on the indoor duties within approximately "thirty

---

[50] *Brown Dep.*, Doc. 30-3 at 8.
[51] *Brown Dep.*, Doc. 30-3 at 8–9.

11

to forty-five days" of his arrival, and ultimately promoted upon completion of that training.[52] Even accepting Brown's training-related allegations as true, the Court finds as a matter of law that neither amounts to a tangible, materially adverse employment action. *See Gehringer v. St. Joseph's/Candler Health Sys., Inc.*, 2013 WL 1180920, at *6 (S.D. Ga. Mar. 20, 2013) ("[D]enial of training, without more, does not constitute an adverse employment action."); *see also, e.g.*, *Sanders v. City of Montgomery*, 319 F. Supp. 2d 1296, 1315 n.16 (M.D. Ala. 2004) ("[T]he Court is not persuaded that the denial of training . . . constituted an adverse employment action in and of itself.").

The Court likewise finds that Brown's written discipline following the Brook Incident cannot be deemed a materially adverse employment action for purposes of his discrimination claims. Brown's pay, title, duties, and workload were unaffected by the written discipline. *See, e.g.*, *Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1322 (M.D. Ala. 2010) (noting that "a reprimand does not constitute an adverse employment action when the employee suffers no tangible harm as a result"). *But see infra* Part III.B.i (discussing *prima facie* retaliation case).

Finally, the same can be said with respect to the vehicular searches, which Brown alleges were requested of him at a frequency much higher than could be said for his white colleagues. However, he admits he faced no discipline, reprimand, or other harm as a result;[53] thus, even accepting his allegations at face value, the Court cannot construe those allegations as sufficient to establish an adverse employment action. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (noting that *prima facie* cases under Title VII's antidiscrimination provision, with respect to adverse employment action, are "limited to discriminatory actions that affect the terms and conditions of employment").

---

[52] *Brown Dep.*, Doc. 30-3 at 21–22, 24, 26.
[53] *See Brown Dep.*, Doc. 30-3 at 42.

b.     <u>Comparator Analysis</u>

Cherokee does not dispute that termination constitutes an adverse employment action as a matter of law. With respect to Brown's ability to establish a *prima facie* case that his termination was racially discriminatory, however, Cherokee argues that Brown has identified no valid comparator and, thus, cannot establish a *prima facie* case under *McDonnell Douglas*.

"[A] meaningful comparator analysis must be conducted at the *prima facie* stage of *McDonnell Douglas*'s burden-shifting framework," rather than at the pretext stage. *Lewis I*, 918 F.3d at 1218. Failure to engage in *bona fide* comparator analysis at the *prima facie* stage would undermine the initial step's very function because "every qualified minority employee who gets fired, for instance, necessarily satisfies the first three prongs of the traditional *prima facie* case." *Id.* at 1223. Thus, "[i]t is only by demonstrating that her employer has treated 'like' employees 'differently'—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*." *Id.* (emphasis in original).

To withstand the inquiry, the plaintiff must identify "someone who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). Whether a similarity or difference is "material" implicates a case-specific inquiry, but "ordinarily, a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Id.* In short, the purported comparator need not be a "doppelganger," but "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis I*, 918 F.3d at 1225, 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)). The focus, in light of the *prima facie* stage's

function, is on whether any distinction between the two employees eliminates the reasonable inference of discrimination against the plaintiff. *See id.*

Brown has failed to identify any non-black employee who is or was similarly situated in all material respects yet escaped termination. Brown attempts to cast Kyle Oakley[54] as a comparator on account of management's investigation into Oakley's vending-machine history for theft, but the Court is unpersuaded. Brown's allegation that retention of Oakley following an identical investigation constitutes more-favorable treatment falls short because, unlike the Brown investigation, the Oakley investigation revealed that no inventory was missing.[55] The fact of the matter is that Brown's investigation turned up a missing grinding wheel that Brown had dispensed *whether or not* he in fact stole the wheel or otherwise lied during the investigation, whereas Oakley's did not.[56]

In a final attempt to save his *McDonnell Douglas* theory, Brown alleges that Cherokee's determination of his theft and dishonesty was not reached in good faith.[57] However, this amounts to an argument that the purported nondiscriminatory basis for Brown's termination was pretextual, which cannot precede identification of a valid comparator. *See, e.g.*, *Lewis I*, 918 F.3d at 1223 ("Absent a qualitative comparison at the *prima facie* stage—*i.e.*, without determining whether the employer treated like cases differently—there's no way of knowing (or even inferring) that discrimination is afoot."). *But see infra* Part III.A.ii.

---

[54] *See Pl.'s Resp.*, Doc. 32 at 16. Kyle Oakley is white. *See Brown Dep.*, Doc. 30-3 at 58.

[55] *Koger Dep.*, Doc. 32-6 at 34, 38.

[56] *See, e.g., Jenkins*, 26 F.4th at 1247–48, 1250. In *Jenkins*, the plaintiff was terminated for violating the Company Insubordination Rule; the evidence at summary judgment conflicted regarding whether plaintiff actually violated the Rule; the parties stipulated that that a purported comparator violated the same Rule without termination; but the Eleventh Circuit nevertheless concluded that latter was not a valid comparator for *McDonnell Douglas* purposes "[a]fter reviewing the facts surrounding [each] violation." 26 F.4th at 1250.

[57] *See Pl.'s Resp.*, Doc. 32 at 24–25.

Having identified no valid comparator,[58] Brown is unable to survive summary judgment by proceeding under the *McDonnell Douglas* umbrella.

## ii.   **Brown has nevertheless presented sufficient evidence of discrimination.**

Brown's inability to offer up a valid comparator, however, does not necessarily doom his race-discrimination claims to summary judgment. *See Lockheed-Martin*, 644 F.3d at 1328. "Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins*, 26 F.4th at 1250 (quoting *Lockheed-Martin*, 644 F.3d at 1328); *see also Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (noting that "convincing mosaic" avenue "is an alternative to the *McDonnell Douglas* framework"); *Lewis v. City of Union City*, 934 F.3d 1169, 1178 (11th Cir. 2019) (*Lewis II*) (same). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Lockheed-Martin*, 644 F.3d at 1328. "This, of course, is perfectly logical" because "[n]ot every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator." *Lewis II*, 934 F.3d at 1185 ("Among other things, a proper comparator may not exist in every workplace.").

A convincing mosaic may be established with evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated

---

[58] Brown additionally attempts to identify Kathy Williams, who allegedly lied during an interview related to the investigation of *Brown*'s Gate Incident but was not fired, as a valid comparator. *See Pl.'s Resp.*, Doc. 32 at 26. The Court rejects this argument for multiple reasons, including that lying during an investigation into one's own suspected misconduct is materially different from lying during the investigation of another. Finally, he attempts to identify Kim Clemmons, who purportedly lied during investigation of his conduct—punching a window—regarding the altercation he had with Brown in July 2020. *See id.* But Brown was not terminated for merely lying during an investigation— Cherokee cited lying, stealing, and swearing.

employes,' and (3) pretext." *Jenkins*, 26 F.4th at 1250 (quoting *Lewis II*, 934 F.3d at 1185); *see also Anterio v. City of High Springs*, 762 F. App'x 891, 897 (11th Cir. 2019) ("A plaintiff may do so by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale.'" (quoting *Holland v. Gee*, 677 F.3d 1047, 1055–56 (11th Cir. 2012))). Above all: "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Tr. V. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin*, 644 F.3d at 1328); *see also Anterio*, 762 F. App'x 891 at 897 ("The phrase 'convincing mosaic' is not a legal test but rather a metaphor to illustrate that the evidence should be viewed as a whole, not 'sorted into boxes,' to determine whether it creates an inference of unlawful discrimination.").

The record in this case, as viewed through a plaintiff-friendly lens, makes clear that the issue of Cherokee's intentional discrimination must ultimately be decided by a jury. Brown identifies evidence of various facts that, taken together, could well lead a reasonable jury to conclude that Brown was fired for the color of his skin. But before turning to a non-exhaustive discussion of that evidence, the Court would be remiss to neglect mention of Cherokee's arguments (or lack thereof), which do not so much as acknowledge the existence of a *McDonnell Douglas* alternative. The Court also reiterates that the following examples are just that—illustrative examples.

For instance, Brown testified that of the approximately seven black employees at the plant during his tenure, six worked on some sort of hill commonly referred to by certain white employees as "nigger hill."[59] During a human-resources interview regarding racism allegations levied against

---

[59] *Brown Dep.*, Doc. 30-3 at 78.

Wade Gaston, another employee essentially said the same thing.[60] Cherokee does not even dispute that evidence's truth but, instead, would have the Court cast it aside as "immaterial"[61] because Brown was never himself stationed on that particular hill. But Brown needn't have worked there himself for a reasonable jury to conclude that race was the basis for his firing. A jury might so decide from the mosaic of circumstances, including that at Cherokee, referring to a location on the plant by way of racial slur is culturally acceptable. *See Jenkins*, 26 F.4th at 1251 (finding that the "mosaic of circumstantial evidence revolves around credibility findings of not only [Supervisor] but other employees who were deposed or provided affidavits"). Also relevant is the fact that Wade Gaston—the supervisor who allegedly stymied Brown's attempts to complete training modules and receive a raise—was investigated for race-related allegations.

   Furthermore, the evidence that Cherokee does dispute (rather than that which it merely terms "immaterial") likewise demonstrates the impropriety of summary judgment here. Although the written warning Brown received for the Brook Incident does not constitute an adverse employment action for purposes of *McDonnell Douglas*, *see supra* Part III.A.i.a, its issuance is not irrelevant.[62] There exists a genuine dispute about whether Brown actually cursed at Brook, and construing that dispute in Brown's favor, a jury might reasonably attribute some more sinister motive to the decisionmakers at Cherokee, such as racial animus. This rings particularly true in light of Brown's termination letter, which cited his prior written warning for cursing as partial grounds for his termination. Relatedly, construing yet another genuine dispute of fact in Brown's favor, Oakley, a white man, received no discipline for cursing at Ben VanVeckhoven, the plant

---

[60] Doc. 32-7 at 3. The employee's name has been redacted from Tate's interview report because the employee wished to remain anonymous. *See id.*

[61] *Def.'s Reply*, Doc. 34 at 2 ¶ 3.

[62] *See Lewis II*, 934 F.3d at 1187–88. ("[A]ccepting, as we must, that Officer Heard and Sergeant McClure do not meet this Circuit's strict definition of similarly situated comparators, the evidence of their treatment in the face of physical limitations on their ability to perform as police officers is not irrelevant.").

manager.[63] Brown's inability to cast Oakley as a similarly situated comparator, *see supra* Part III.A.i.b, does not render irrelevant the evidence of Cherokee's reprimanding Brown, but not Oakley, for very similar (if not identical) conduct. *See Lewis II*, 934 F.3d at 1187–88.

A jury, not this Court, is properly situated to decide whether Brown's race was the basis for his termination. It may believe Brown's version of events and, as a result, ultimately conclude that the circumstances surrounding Brown's termination indicate that race unlawfully infected the process. *The converse, of course, is equally true, and therein lies the function of the "convincing mosaic" inquiry, which ensures jury questions are answered by juries.* In sum: Because Brown has presented circumstantial evidence, of various sorts, from which a reasonable factfinder could conclude that he was terminated on the basis of race, Cherokee's motion for summary judgment on Brown's Title VII and § 1981 discrimination claims must be denied.

## B.      Retaliation

Brown alleges that Cherokee unlawfully retaliated against him for taking FMLA leave by issuing him written discipline and by terminating his employment. Brown also alleges that he was disciplined and terminated in retaliation for his complaints about race discrimination at work.

The *McDonnell Douglas* framework applies to retaliation claims sought to be proved by circumstantial evidence. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344 (11th Cir. 2022) (Title VII); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009) (Section 1981); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (ADA); *Zarza v. Tallahassee Housing Auth.*, 686 F. App'x 747, 754 (11th Cir. 2017) (FMLA). To establish a *prima facie* retaliation case, "an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists

---

[63] *Brown Dep.*, Doc. 30-3 at 22, 58–59, 78–79; *see also Tate Dep.*, Doc. 32-2 at 52.

between the two." *Batson v. Salvation Army*, 897 F.3d 1320, 29 (11th Cir. 2018). "If the plaintiff can establish that, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the retaliation." *Patterson*, 38 F.4th at 1345. "If the employer does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." *Id.*

   i. **Brown has established a *prima facie* retaliation case.**

  Because Brown's *prima facie* case relies exclusively upon temporal proximity to prove a causal connection between his engagement in protected activity and Cherokee's adverse employment action, and Cherokee disputes Brown's ability as a matter of law to do so, the Court must address an ambiguity that continues to plague caselaw addressing that issue.

  In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court made clear that "retaliation claims must be proved according to traditional principles of but-for causation." 570 U.S. 338, 360 (2013) ("This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Before *Nassar* was handed down, "close temporal proximity alone was sufficient" to prove causation at the *prima facie* stage. *Montgomery v. Bd. of Trustees*, 2015 WL 1893471, at *4 (N.D. Ala. Apr. 27, 2015)*. But in *Nassar*'s wake, the cases "have been inconsistent on the question whether *Nassar*'s but-for causation standard applies at the *prima facie* stage of the summary judgment analysis or whether it is at the pretext stage of the analysis when the plaintiff must satisfy this standard." *See Gogel v. Kia Mfg., Inc.*, 967 F.3d 1121, 1135 n.13 (11th Cir. 2020) (en banc) (noting the jurisprudential split before assuming, *in dicta*, "that the but-for test is to be applied at the pretext stage of the summary judgment examination"); *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1294, 1294 n.5 (11th Cir. 2021) (noting the en banc *Gogel* court's assumption that

*Nassar* does not affect *prima facie* analysis and employing same assumption); *cf. Montgomery*, 2015 WL 1893471, at *3–4 (applying but-for standard at *prima facie* stage and stating that "[p]ost-*Nassar* causation based only upon close temporal proximity has lost its sway"). If *Nassar* applies at the *prima facie* stage, a retaliation plaintiff is presumably unable to rely solely on temporal proximity—however close—for purposes of establishing a causal connection between the protected activity and the adverse employment action. *See Montgomery*, 2015 WL 1893471, at *3–4 (deciding that "temporal proximity alone does not meet the new [*prima facie*] causation standard").

The undersigned acknowledges, and tends to agree with, the particularly astute reasoning presented in Judge Acker's 2015 decision to apply *Nassar* at the *prima facie* stage. *See Montgomery*, 2015 WL 1893471, at *3–4 (finding 14-day proximity insufficient and predicting "that any reluctance by the Eleventh Circuit to fully to embrace *Nassar* has dissipated"). The Court must note, however, that in the approximately eight years since, the Eleventh Circuit seems to have maintained reliance on pre-*Nassar* precedent to articulate the burden of establishing *prima facie* causation by way of close temporal proximity alone, despite not yet expressly putting the issue to bed. *See, e.g.*, *McNeal v. Int'l Paper*, 2022 WL 5434274, at *5 (11th Cir. Oct. 7, 2022) ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006))); *Callahan v. City of Jacksonville*, 805 F. App'x 749, 752–53 (11th Cir. 2020) ("Causation may be inferred by 'close temporal proximity between the statutorily protected activity and the adverse employment action.'" (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007))).

20

As such, the undersigned will follow the Eleventh Circuit's implicit lead and decline to require demonstration of but-for causation at the *prima facie* stage; instead, to prove *prima facie* causation, Brown must only "show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Patterson*, 38 F.4th at 1351 (quoting *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017)).

### a.   Title VII & Section 1981 Retaliation

To establish a *prima facie* case for race-based retaliation, Brown cites two events as adverse employment actions: his March 2021 written discipline and his April 2021 termination. He claims that each resulted from his complaints of racial discrimination following the Clemmons and Brooks incidents, which he discussed in a February 2021 meeting with Michael Foster and Linda Peloquin.[64]

As an initial matter, the parties disagree about whether the writeup constitutes an adverse employment action. Though it did not for purposes of Brown's discrimination claims, *see supra* Part III.A.i.a, it does here because "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment.'" *Glass v. Supreme Beverage Co.*, 2012 WL 13048225, at *1 (N.D. Ala. Feb. 3, 2012) (quoting *Burlington Northern*, 548 U.S. at 64); *see also Davidson v. Affinity Hosp. LLC*, 2020 WL 6119476, at *14 (N.D. Ala. Oct. 16, 2020) (assuming that disciplinary writeups "constitute[d] actionable adverse employment actions for purposes of Plaintiff's FMLA retaliation claim"). Brown has proved that the writeup was not a "petty snub[]," *Davidson*, 2020 WL 6119476, at *14, particularly where it was cited as partial grounds for his termination. Thus, for purposes of Brown's retaliation claims, the writeup is an adverse action.

---

[64] *See Brown's Resp.*, Doc. 32 at 29; *see also supra* Part I.C.

As for the *prima facie* case's causal-connection requirement, neither the March 2021 writeup nor Brown's April 2021 termination were separated by even three-months' time from his February 2021 meeting with Peloquin and Foster, in which Brown complained of alleged race discrimination. That timespan is sufficient for *prima facie* purposes. *See, e.g.*, *Flynn v. Fidelity Nat'l Mgmt. Servs.*, 2017 WL 1155399, at *5 (M.D. Fla. Mar. 28, 2017) ("[T]he general rule is that a period of less than three months between the employee's protected activity and the employer's adverse action is sufficient on its own to establish *prima facie* causation."); *Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (finding gap of approximately two months sufficient at *prima facie* stage); *cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (noting that temporal proximity may suffice but finding that "three to four month disparity . . . is not enough" on its own, in which case a plaintiff needs additional evidence at the *prima facie* stage).

### b.     FMLA & ADA Retaliation

Brown additionally claims that Cherokee disciplined and terminated him for taking disability-based FMLA leave February 5, 2021, through March 22, 2021. For the reasons stated *supra* Part III.B.i.a, Brown has established a *prima facie* retaliation case under the FMLA and ADA.

### ii.     Burden Shifting

Cherokee has produced nondiscriminatory bases for disciplining and terminating Brown, namely his purported violation of company policy regarding respect and professionalism, theft, and honesty during investigations. Brown's retaliation claims are accordingly due to be dismissed absent sufficient proof that he "will be able to establish at trial that [Cherokee's] proffered nondiscriminatory reasons are a pretextual ruse designed to mask retaliation." *Stewart v. Happy*

*Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). In other words, Brown must identify evidence, viewed in his favor, from which a reasonable jury could conclude that protected activity was a but-for cause of the writeup and/or his termination. *Gogel v. Kia Mfg., Inc.*, 967 F.3d 1121, 1135 n.13 (11th Cir. 2020) (en banc) ("[I]n the summary judgment context, the question [is] whether a reasonable jury could find that the employer's explanation was pretextual and that the plaintiff's complaint was the but-for cause of her termination." (citation omitted)); *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (citing *Nassar* and describing plaintiff's burden at pretext stage "to come forward with enough evidence from which a reasonable juror could find that his complaint of race discrimination—his protected activity— was 'a but-for cause' of his termination")

To do so without either direct evidence of retaliation or a similarly situated comparator, "a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136 (citation and internal punctuation omitted). The plaintiff's evidence is insufficient to prove pretext unless it shows "*both* that the reason was false, *and* that retaliation was the real reason." *Id.* (emphasis in original).

As an initial matter, Brown has identified no evidence (other than temporal proximity) demonstrating that either the writeup or his termination were in any way related to his FMLA leave. His retaliation claims under the ADA and FMLA are accordingly due to be dismissed. *See Feise*, 683 F. App'x at 753 (stating that "temporal proximity alone generally is insufficient to establish pretext"); *Hurlbert*, 439 F.3d at 1298 ("The close temporal proximity between [plaintiff's] request for leave and his termination—no more than two weeks, under the broadest

reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself.")

Brown's ability to show that Cherokee's proffered justifications are but a coverup for racially discriminatory animus is, however, a different matter entirely. While Brown has not identified a similarly situated comparator, he has presented evidence contradicting Cherokee's explanations and, in addition, identified inconsistencies in Cherokee's evidence surrounding the basis for his termination. *See supra* Parts I.D, III.A.ii.

To be sure, "the inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Feise*, 683 F. App'x at 753 (citation omitted); *accord Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the pretext analysis "is limited to whether the employer gave an honest explanation of its behavior"). But the inconsistencies Brown identifies call into question not merely whether Brown violated company policy in fact; they raise questions about whether Cherokee's decisionmakers *actually believed* that Brown violated company policy. *See supra* Parts I.D, III.A.ii.

A jury must decide, *inter alia*, whether Brown's supervisors truly believed that he stole the $2.45 grinding wheel, lied during the investigation, and cursed supervisors, or alternatively whether the story was concocted in an attempt to conceal animus toward Brown's complaints of race discrimination. A reasonable jury might disbelieve Cherokee and instead conclude that its proffered justifications are bogus. Upon reaching such a conclusion, the jury might additionally find from the suspect timeline of events in this case—*together* with all other race-related evidence detailed *supra*—that Brown would not have been disciplined and/or fired had he not complained

of race discrimination. Or it may not. This Court, however, has no delusion about its lack of authority to answer that question.

## IV.     CONCLUSION

For the foregoing reasons, Cherokee's motion for summary judgment (Doc. 30) is due to be **GRANTED in part and DENIED in part**. More specifically, Brown's ADA and FMLA claims are due to be **DISMISSED with prejudice**, but his Title VII and § 1981 claims—both for discrimination and retaliation—present genuine issues of fact to be resolved at trial.

**DONE** and **ORDERED** August 9, 2023.

LILES C. BURKE
UNITED STATES DISTRICT JUDGE